The **STATE** of Ohio ex rel. **BADGETT**

v.

**MULLEN, Mayor, et al.**

and

**Newman et al., Intervenors.**

[Cite as *State ex rel. Badgett v. Mullen*, 177 Ohio App.3d 27, 2008-Ohio-2373.]

Court of Appeals of Ohio,
Fourth District, Washington County.

No. 06CA61.

Decided May 8, 2008.

</div>

28

30

Spater Law Office and Alexander M. Spater, for relator James M. Badgett.

Roland W. Riggs III, Marietta City Law Director, for respondents Michael Mullen, city of Marietta, Paul Bertram III, Randall Burnworth, Sam Gwinn, Katie McGlynn, Kathy Shively, Tom Vukovic, and Judy Wray.

Theisen Brock, L.P.A., and James S. Huggins, for respondent Andrew M. Thompson.

The McTigue Law Group, Donald J. McTigue, and Mark A. McGinnis, for intervenors Glenn Newman, Jeff Starner, and Dave Haney.

---

HARSHA, Judge.

{¶ 1} Relator James M. Badgett filed a taxpayer mandamus action under R.C. 733.58 and 733.59 against the city of Marietta, the mayor of Marietta, the president of the Marietta City Council, and the members of the Marietta City Council ("the city") alleging that they have not provided "suitable accommodations" for the Marietta Municipal Court as required by R.C. 1901.36. The city contends that Badgett does not have standing to bring this action, because he is not a judge, clerk, or other employee of the municipal court. We disagree because there is no statutory language or case law that restricts the mandamus remedy to complaints filed by a court or its employees. Furthermore, Badgett has met the requirements of R.C. 733.58 and 733.59: he made a written request for the city law director to file a mandamus action, and he is a taxpayer pursuing this action on behalf of and for the benefit of the public.

{¶ 2} We also find that Badgett has satisfied the requirements for the issuance of a writ of mandamus. He has demonstrated that the city has not provided "suitable accommodations" for the Marietta Municipal Court even though it is required to do so by R.C. 1901.36. The evidence establishes that the court facilities are wholly inadequate and, although there has been talk of replacing the facilities for 25 years, that the municipal court has not been improved as needed. Under R.C. 1901.36, the city has a clear legal duty to provide the necessary court facilities, and the citizens of Marietta are entitled to those court facilities.

Further, Badgett has demonstrated that he does not have a plain and adequate remedy at law.

{¶ 3} Finally, we grant Badgett's request for attorney fees. Under R.C. 733.61, a court has discretion to award attorney fees to a taxpayer who brings a successful action under R.C. 733.59. Because Badgett has successfully prosecuted this action and has achieved a public benefit, we find that attorney fees are warranted.

## I. Procedural History

{¶ 4} Badgett filed a complaint in mandamus against the city of Marietta; Michael Mullen, the mayor of the city of Marietta; Paul Bertram III, president of the Marietta City Council; and Randall Burnworth, Sam Gwinn, Katie McGlynn, Kathy Shively, Andrew Thompson, Tom Vukovic, and Judy Wray, members of the Marietta City Council (collectively, "the city"). Badgett alleges that the city failed to provide suitable accommodations for the Marietta Municipal Court in violation of R.C. 1901.36 and Appendix C and D of the Supreme Court of Ohio Rules of Superintendence. He further asserts that he has no plain and adequate remedy at law and that the relief sought is a matter of public interest.

{¶ 5} With the exception of Bertram, the city answered the complaint. Bertram filed a motion to dismiss himself from the action on the ground that he is not a member of the city's "legislative authority" that is responsible for providing suitable accommodations for the Marietta Municipal Court under R.C. 1901.36 because, as the president of the Marietta City Council, he is actually a member of the executive rather than the legislative branch of city government. After we denied his motion to dismiss, Bertram also filed an answer to the complaint.

{¶ 6} Glenn Newman, Jeff Starner, and Dave Haney (collectively, "intervenors") filed a motion to intervene pursuant to Civ.R. 24. In support of their motion, the intervenors stated that the Marietta voters passed an initiative petition in November 2006 prohibiting the "expenditure of public moneys for construction, leasing, renting, furnishing, equipping, or maintenance of new building or office space for the Marietta Municipal Court or for the relocation of the Marietta Municipal Court from its present location." The intervenors are the individuals designated on the face of the initiative petition as the committee to represent the petitioners under R.C. 731.34. They sought to intervene to ensure that the initiated law becomes effective and that no money is spent on a new municipal court building. We granted the motion to intervene under Civ.R. 24(B)(2).

{¶ 7} The parties filed evidence with this court, including depositions and exhibits, and briefs arguing their positions. Additionally, Badgett filed a motion

for an order that waives the costs for security or, in the alternative, assesses the security. We granted this motion and waived the security costs.

{¶ 8} The complaint is now ripe for decision.

## II. Standing

{¶ 9} Before examining the merits of Badgett's complaint, we must first determine whether he has standing to bring this action. A court can consider the merits of a legal claim only if the person seeking relief establishes that he has standing to sue. *Ohio Contractors Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088, 1089. Badgett contends that he has standing under R.C. 733.58 and 733.59.

{¶ 10} R.C. 733.59 states:

If the * * * city director of law fails, upon the written request of any taxpayer of the municipal corporation, to make any application provided for in sections 733.56 to 733.58 of the Revised Code, the taxpayer may institute suit in his own name, on behalf of the municipal corporation.

R.C. 733.58 states:

In case an officer or [a] board of a municipal corporation fails to perform any duty expressly enjoined by law or ordinance, the * * * city director of law shall apply to a court of competent jurisdiction for a writ of mandamus to compel the performance of the duty.

{¶ 11} Badgett contends that the city failed to perform the duty imposed by R.C. 1901.36, which states, "The legislative authority of a municipal court shall provide suitable accommodations for the municipal court and its officers." The parties concede that Badgett requested in writing that the city law director take legal action to compel the city to provide suitable accommodations for the Marietta Municipal Court and that the law director refused to bring such a lawsuit. Therefore, Badgett contends that he has standing to bring the action in his own name.

{¶ 12} As the Twelfth District Court of Appeals held in *Home Builders Assn. of Dayton & Miami Valley v. Lebanon,* 167 Ohio App.3d 247, 2006-Ohio-595, 854 N.E.2d 1097, at ¶ 50:

With respect to actions brought under R.C. Chapter 733, the Ohio Supreme Court has defined "taxpayer" as "any person who, in a private capacity as a citizen, elector, freeholder or taxpayer, volunteers to enforce a right of action on behalf of and for the benefit of the public." *State ex rel. Nimon v. Springdale* (1966), 6 Ohio St.2d 1, 215 N.E.2d 592, paragraph two of the syllabus. Consistent with that definition, in order to have standing to bring a taxpayer suit under R.C. Chapter 733, the taxpayer's aim must be to enforce a

public right, regardless of any personal or private motive. *Cleveland ex rel. O'Malley v. White*, 148 Ohio App.3d 564, 2002-Ohio-3633, 774 N.E.2d 337, ¶ 45. When the suit is merely for the taxpayer's own benefit, no public right exists, and the taxpayer action cannot be maintained. *State ex rel. Caspar v. Dayton* (1990), 53 Ohio St.3d 16, 20, 558 N.E.2d 49.

Badgett is bringing this action to enforce a right or action on behalf of and for the benefit of the public. Furthermore, there is no evidence that he has brought this action merely for his own benefit.

{¶ 13} The city and intervenors contend that Badgett has no standing as a citizen because actions to require suitable accommodations for the municipal court may only be brought by a municipal court judge, clerk of courts, or other employee of the affected municipal court. In support of their argument, respondents and the intervenors cite numerous cases where the relators alleged noncompliance with R.C. 1901.36. See, e.g., *State ex rel. Taylor v. Delaware* (1982), 2 Ohio St.3d 17, 2 OBR 504, 442 N.E.2d 452 (action brought by municipal court judge); *State ex rel. Musser v. Massillon* (1984), 12 Ohio St.3d 42, 12 OBR 36, 465 N.E.2d 400 (lawsuit filed by municipal court judges); *State ex rel. Durkin v. City Council of Youngstown* (1984), 9 Ohio St.3d 132, 9 OBR 382, 459 N.E.2d 213 (action brought by municipal court clerk); *State ex rel. Hillyer v. Tuscarawas Cty. Bd. of Commrs.* (1994), 70 Ohio St.3d 94, 637 N.E.2d 311 (action filed by county court judge); *State ex rel. O'Farrell v. New Philadelphia City Council* (1991), 57 Ohio St.3d 73, 565 N.E.2d 829 (action filed by municipal court judge and clerk); *State ex rel. Cramer v. Crawford Cty. Bd. of Commrs.* (Jun. 19, 1984), Crawford App. No. 3–84–17, 1984 WL 7964 (action filed by municipal court clerk and judge). They assert that because none of these cases have been brought by a private citizen, this action cannot be filed by Badgett and can be maintained only by the current Marietta Municipal Court judge. In other words, they argue that because it has not been done yet, it is not capable of being done.

{¶ 14} Notably, respondents and the intervenors have not cited any cases in which a court has held that a taxpayer cannot bring an action under R.C. 733.59 alleging a legislative authority's failure to comply with R.C. 1901.36. Nor is there any language in either of these statutes that limits their application in such a manner. In the absence of restriction in the statute or binding case law, the fact that no private citizen has brought such a case before does not mean it is prohibited. We will not infer a limitation on the public's right to bring a taxpayer action based merely upon the fortuitous absence of a prior exercise of that right. We are persuaded that Badgett has standing to bring this action as a taxpayer pursuant to R.C. 733.58 and 733.59.

### III. Writ of Mandamus

{¶ 15} In order for this court to grant a writ of mandamus, Badgett must establish (1) a clear legal right to the requested relief, (2) a clear legal duty to perform these acts on the part of respondents, and (3) the lack of a plain and adequate remedy in the ordinary course of law. *State ex rel. Neff v. Corrigan* (1996), 75 Ohio St.3d 12, 16, 661 N.E.2d 170. The "function of mandamus is to compel the performance of a present existing duty as to which there is a default. It is not granted to take effect prospectively, and it contemplates the perform-ance of an act which is incumbent on the respondent when the application for a writ is made." *State ex rel. Willis v. Sheboy* (1983), 6 Ohio St.3d 167, 6 OBR 225, 451 N.E.2d 1200, paragraph two of the syllabus.

#### 1. Legal Right to Relief/Legal Duty to Perform Acts

{¶ 16} Because they are interrelated here, we consider the first two require-ments for the issuance of a writ of mandamus together. Badgett contends that the existing municipal court facilities are wholly inadequate and that under R.C. 1901.36, the city has a clear legal duty to provide suitable court facilities.

{¶ 17} R.C. 1901.36 states:

(A) The legislative authority of a municipal court shall provide suitable accommodations for the municipal court and its officers. The legislative authority of a county-operated municipal court may pay rent for the accommo-dations.

The legislative authority shall provide for the use of the court suitable accommodations for a law library, complete sets of reports of the supreme and inferior courts, and such other law books and publications as are considered necessary by the presiding judge, and shall provide for each courtroom a copy of the Revised Code.

The legislative authority shall provide any other employees that are neces-sary, each of whom shall be paid such compensation out of the city treasury as the legislative authority prescribes, except that the compensation of these other employees in a county-operated municipal court shall be paid out of the treasury of the county in which the court is located, as the board of county commissioners prescribes. It shall provide all necessary form books, dockets, books of record, and all supplies, including telephone, furniture, heat, light, and janitor service, and for such other ordinary or extraordinary expenses as it considers advisable or necessary for the proper operation or administration of the court.

{¶ 18} Badgett relies primarily on the testimony of Municipal Court Judge Janet Dyar Welch to prove that the current court facilities are not suitable as

required by R.C. 1901.36 and that they do not comply with the Supreme Court of Ohio Rules of Superintendence, Appendix D, pertaining to court facilities, or Appendix C, pertaining to court security.[1] Additionally, Badgett submitted an affidavit attesting to his personal experiences in the municipal court.

{¶ 19} According to Badgett, the alleged deficiencies are

(1) inadequate square footage and inefficient layout (Welch Dep. 7–9, 14–16, Exhibit 2);

(2) heating and air conditioning are inadequate (Welch Dep. 8–9, 77–78);

(3) leaks in courthouse ceiling (Welch Dep. 10–11);

(4) no separation between judicial and nonjudicial offices (Welch Dep. 12–13);

(5) inadequate seating for litigants and others in the courtroom (Welch Dep. 18–22, 83; Badgett Affidavit ¶ 8);

(6) tables and chairs used as counsel tables in the courtroom are too close to the jury box so litigants and counsel cannot have private conversations without the jury overhearing. The courtroom space for both the prosecution and defense counsel is inadequate and there is insufficient courtroom space to use larger tables (Welch Dep. 22–24);

(7) there is no private access from the judge's chambers to the courtroom, as it is shared with jurors, and no separate entry points for the judge, staff, prisoners, and members of public (Welch Dep. 22);

(8) the magistrate does not have a courtroom or hearing room and may use the jury room as a hearing room only on days when juries are not present, creating scheduling conflicts. The magistrate also does not have office space in the courthouse and must work off-site, making it difficult for the magistrate and the judge to meet (Welch Dep. 26–28, Badgett Affidavit ¶ 9);

(9) there is no private restroom for jurors (Welch Dep. 28–30);

(10) there is no adequate waiting room for jurors as the jury room does not provide adequate space when a jury panel appears (Welch Dep. 30–31);

(11) no telephone for jurors (Welch Dep. 31);

(12) no separate consultation room for attorneys when the jury room is in use (Welch Dep. 31–33);

(13) the jury room serves as an all-purpose hearing room and conference room, creating scheduling conflicts because it is regularly used by the magistrate as well as the probation department (Welch Dep. 34);

---

1. Appendices C & D are attached as an appendix to this opinion.

(14) facilities for violations bureaus and pay-in windows are not located near public parking areas (Welch Dep. 36);

(15) the court is not accessible to people with disabilities (Welch Dep. 37–40, 45–46);

(16) there is inadequate storage space for court records (Welch at 40–42, 84);

(17) there is only one women's and one men's restroom that are used by the court, jurors, the staff of the law director, and members of the general public. The women's bathroom has only one commode (Welch Dep. 29–30, 42–44); and

(18) the court's security system is inadequate as there is no weapons screening for persons entering the court, no uniformed and armed law enforcement officer assigned to the court, and prisoners and the public use the same hallway as the judge and court staff (Welch Dep. 64–65, 68).

{¶ 20} Although the city quibbles with some of the specific inadequacies alleged by Badgett, i.e., that there are leaks from the ceiling, and they contend that they are attempting to address some of the deficiencies, i.e., by installing panic buttons in the court, they generally agree that there is significant room for improvement of the court facilities. However, they contend that the facilities are nonetheless suitable as required by R.C. 1901.36 and that the majority of Appendix D and all of Appendix C are recommendations and not mandatory requirements for a courthouse. Further, they contend that the city of Marietta is in dire financial straits and simply cannot afford to build a new courthouse at this time.

a. Standard for Defining "Suitable Accommodations"

{¶ 21} First, we must determine the definition of "suitable accommodations" in R.C. 1901.36. "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory interpretation." *Cline v. Ohio Bur. of Motor Vehicles* (1991), 61 Ohio St.3d 93, 96, 573 N.E.2d 77. However, R.C. 1901.36 does not explicitly define "suitable accommodations," and we find that the term is ambiguous. Nonetheless, the Supreme Court of Ohio has already addressed how to determine whether court accommodations are suitable within the meaning of R.C. 1901.36.

{¶ 22} In *State ex rel. Taylor v. Delaware* (1982), 2 Ohio St.3d 17, 18, 2 OBR 504, 442 N.E.2d 452, the Supreme Court held that M.C.Sup.R. 17—now Appendix D to the Rules of Superintendence—is "intended to provide basic guidelines for facilities of municipal and county courts." Therefore, "[a]lthough not all of the provisions of the rule are mandatory in character, the standards set forth in the rule should be taken into consideration in measuring the adequacy of existing court facilities * * *." Id.

{¶ 23} And in *State ex rel. Hillyer v. Tuscarawas Cty. Bd. of Commrs.* (1994), 70 Ohio St.3d 94, 95–96, 637 N.E.2d 311, 313, the Supreme Court again reached a similar conclusion. In *Hillyer*, the county court judge filed a complaint in mandamus alleging that the court facilities were inadequate for many of the same reasons that Badgett cites—it was difficult to separate opposing witnesses due to limited space, counsel were required to take their clients outside to discuss confidential matters, the courtroom was too small to hold all defendants and spectators during traffic court, there was no waiting room for jurors, there was no private access from chambers to the courtroom, there was no consultation room for attorneys and clients, and the facilities did not comply with M.C.Sup.R. 17 (now Appendix D to the Rules of Superintendence)—in addition to claiming that the court furniture was old and insufficient and there was no jury room. In interpreting an analogous statute to R.C. 1907.17 requiring that the board of county commissioners provide suitable county court facilities, the Supreme Court of Ohio affirmed its holding in *Taylor* that the Rules of Superintendence be used as a measuring stick in determining whether court facilities are suitable. Id. at 99, 637 N.E.2d 311.

{¶ 24} Based on the holdings in *Taylor* and *Hillyer*, we look to the Rules of Superintendence for guidance in determining whether the legislative authority of Marietta has met its duty of providing "suitable accommodations" for the municipal court as required by R.C. 1901.36.[2]

{¶ 25} The city and intervenors contend that Appendix D does not contain mandatory requirements that bind the legislative authority because the vast majority of the standards state only that the court "should" have certain items, i.e., "[t]he courtroom *should* have adequate seating." Appendix D, Section (C). They contend that only sections (A), (C), and (I) of Appendix D contain mandatory provisions; therefore, these are the only provisions that they can be held accountable for violating. Likewise, they note that Appendix C specifically states in its preamble that "[t]hese standards are not mandates."

{¶ 26} Ordinarily, we would agree with this position. The word "shall" in a statute is construed as mandatory, while the word "should" is construed as directory. *State v. Book*, 165 Ohio App.3d 511, 2006-Ohio-1102, 847 N.E.2d 52, at ¶ 20. However, here, we are construing these standards not as mandatory requirements but rather using them in deciding the factual issue of whether the Marietta Municipal Court facilities are suitable as defined in R.C. 1901.36. See

---

2. At the time *Taylor* and *Hillyer* were decided, Appendix C, governing court security standards, did not exist. However, Appendix C is now part of the Rules of Superintendence; therefore, we consider it in determining whether the municipal court facilities are suitable in the same way we consider Appendix D.

*Hillyer,* 70 Ohio St.3d at 99, 637 N.E.2d 311 (court of appeals properly considered Rules of Superintendence in measuring suitability of court facilities despite their nonmandatory nature). Moreover, to hold that the Rules of Superintendence should not be considered in determining the adequacy of the court facilities would be in direct contravention to the Supreme Court of Ohio's holdings in *Taylor* and *Hillyer.* See, also, *State ex rel. Musser v. Massillon* (1984), 12 Ohio St.3d 42, 45–46, 12 OBR 36, 465 N.E.2d 400 (granting writ of mandamus seeking accommodations for referee based on M.C.Sup.R. 17(E), stating that "[r]eferees should have courtroom and office facilities similar to those of a judge * * * ").

b. Respondents Have Not Provided "Suitable Accommodations"
for the Marietta Municipal Court

{¶ 27} Because this is an original action, we serve as the finder of fact and determine whether the municipal court facilities are suitable without the lens of deference that normally applies to appellate decision-making. Having reviewed the depositions, exhibits, and affidavit submitted, we conclude that the facilities are not suitable. Frankly, this is not a difficult determination to make—particularly because the city and intervenors acknowledge that the facilities have many flaws and dispute very few of the claimed inadequacies cited by Badgett and Judge Welch.

{¶ 28} It is clear from the record that the municipal court facilities impede the fair and efficient administration of justice in Marietta and appear to be an unsafe environment for the judge, court staff, litigants, counsel, and the general public. The staff at the courthouse must use space heaters in the winter because the heat is inadequate, even though they have been advised against this practice. There is sagging and discolored tile where water has damaged the ceiling, and water accumulated in a light fixture. The city law director's office and civil clerk's office have only a partial dividing wall between them resulting in the staff from either office having the ability to access the other's facilities.

{¶ 29} The facilities are clearly too small. Although an architectural report recommended a space of approximately 7,300 square feet, the current court is only 1,983 square feet—well less than half the space needed. There is inadequate seating in the courtroom, resulting in litigants, observers, and potential jurors having to wait in the hallway or on the stairwell. There are only two small counsel tables in the courtroom, so there is not always enough room for the parties and their lawyers to converse privately. In fact, one end of a table abuts the jury box so that the party and counsel are unable to have a private conversation.

{¶ 30} The area from the judge's chambers to the courtroom is shared by the judge and the jurors and there is no separation between court staff, the judge,

members of the public, and prisoners. The magistrate does not have an office or a hearing room, so she must schedule her work so that it doesn't conflict with jury day. When not holding hearings, the magistrate must work offsite because there is no office space where she can work, making it difficult for her to meet with the judge when necessary. When the magistrate holds hearings, the parties must sit around the jury table and there is no courtroom decorum. Further, the jury room is not monitored by any security. The jury room is also used by the probation office to meet with defendants every morning and by the court for meetings. The multiple uses for this room make scheduling very difficult.

{¶ 31} There is no private restroom for the jurors to use and potential jurors are not separated in a jury assembly area. A portable room divider is place in the hallway to separate the jurors from the parties. Although this provides visual separation, there is no sound separation. There is only one men's restroom on the first floor and one women's restroom on the second floor—with only one commode—for use by all the offices in the building plus the public. Additionally, there is a locked unisex bathroom on the first floor that can be used by all Marietta city employees. There is no public telephone.

{¶ 32} There is no separate room for use by the attorneys. Instead, they must use the employee break room and ask any court staff in the room to leave or walk outside to speak with their clients privately.

{¶ 33} The violations bureau is located on the second floor, not near a parking area, and the counter in the bureau is at least four feet tall. There are also access issues with the court because anyone with a physical disability must go to the police department to use the elevator. Access to the elevator is impeded because it is in a secure part of the building and a dispatch officer must escort the person to the elevator. The dispatch officer notifies the court and a court employee must get the key, take the elevator to the first floor, and bring the disabled person to the second floor. The reverse process is followed when the person leaves, or when a disabled man needs to use the restroom on the first floor. Additionally, a standard-size wheelchair doesn't easily fit in the elevator. And if an employee was in a wheelchair or used a walker, he couldn't access the space between the bailiff's desk and the bench to enter the main facility of the clerk's office. Furthermore, several doorways in the courthouse are less than the standard wheelchair size, and the back door of the courtroom—which the general public uses—cannot be opened by a disabled person without assistance.

{¶ 34} Because the clerk's office is too small, a jail cell area is used for record storage. That area is inadequate to hold all the files the clerk is required to maintain; therefore, a small room down the street is also used to hold files. Additionally, older files are stored at the former fire station on the west side of Marietta—on the other side of the river—requiring court staff to drive and

retrieve files when necessary. The trip takes at least 20 minutes, not including the time to locate the file, and someone must go there more than one time per week.

{¶ 35} The court's security system is wholly inadequate. There is no screening of persons entering the courtroom and no uniformed, armed law-enforcement officer assigned specifically to the court. There is an armed bailiff, but he has multiple responsibilities in the courtroom and is not a court security officer. Further, the prisoners, public, and court staff all travel the same hallways. Although there is a duress system now, it doesn't have enunciation capability or identify the location of the panic.

{¶ 36} Based on this evidence, we conclude that the Marietta Municipal Court does not comply with many of the court facility standards outlined in Appendix D of the Rules of Superintendence. The court is not adequately heated and air-conditioned (A) and is not separate from nonjudicial governmental agencies (B), the courtroom does not have adequate seating capacity (C), tables are not situated to allow private interchanges between litigants and counsel (C), the judge does not have private access to the courtroom from chambers (C); the magistrate does not have a courtroom or office facilities similar to those of a judge (E), there are no private personal convenience facilities available for the jurors (F), there is no consultation room provided for the use of attorneys (G), the facilities for the violations bureau are not located near public parking areas (H), there is not adequate space and equipment for court personnel to prepare, maintain, and store necessary court records (I), there are not adequate restroom facilities separate from the public restroom facilities for all court personnel (I), and public telephones are not available (J).

{¶ 37} Additionally, the court security standards are inadequate under Appendix C. Persons are not subject to security screening (3), there are no uniformed, armed law-enforcement officers assigned to the court (4), prisoners are transported through areas accessible to the public (6), and the duress alarms do not have enunciation capability (7).

{¶ 38} We readily acknowledge that a deficiency concerning one or two—or perhaps even more—of the guidelines in Appendix D or Appendix C would not render a court facility unsuitable. However, here the deficiencies are so numerous and so serious that we simply cannot conclude that the city has provided "suitable accommodations" for the municipal court as required by R.C. 1901.36. We find that Badgett has demonstrated that he has a clear legal right to the relief requested—on behalf of the taxpayers of Marietta—and that the city has a clear legal duty to provide "suitable accommodations" for the Marietta Municipal Court pursuant to R.C. 1901.36. Therefore, we conclude that Badgett has established the first two requirements for the issuance of a writ of mandamus.

## 2. No Plain and Adequate Remedy at Law

{¶ 39} Badgett must also demonstrate that he has no plain and adequate remedy at law. In its answer, the city admitted that Badgett has no plain and adequate remedy at law. However, the city and intervenors contend that—at least as to the claims pertaining to the lack of access to the courthouse for those who are disabled—Badgett could file an action in federal court under the Americans with Disabilities Act ("ADA").

{¶ 40} We agree that Badgett does have a remedy under the ADA. However, this remedy applies to only a very small portion of his complaint; therefore, it would not bar the bulk of his complaint.[3] We conclude that Badgett does not have a plain and adequate remedy at law concerning the remainder of his complaint.

## IV. Objections Raised by the City and Intervenors

{¶ 41} The city and intervenors have raised several additional arguments in support of their contention that we should not grant this writ of mandamus. We will explain why we find no merit in these arguments.

### 1. The City Has No Clear Duty to Perform Because Judge Welch Has Not Made Specific Demand on City Council

{¶ 42} The city contends that Badgett has not satisfied the first two requirements for the issuance of a writ of mandamus because there is no evidence in the record that Judge Welch specifically demanded that the Marietta City Council provide adequate facilities.

{¶ 43} We reject this argument. First, it is clear from the record that Judge Welch has informed the Marietta City Council that the existing facilities are wholly inadequate. Second, when the mayor and/or city council sought her opinion as to whether the existing facilities or another building available for purchase could be renovated to satisfy the municipal court's needs, she clearly informed them of her opinion that neither of those options would be satisfactory. Judge Welch testified that she informed Mayor Mullen and the Marietta City

---

3. The city and intervenors also contend that we should not consider Badgett's ADA claims because they were not pleaded in his complaint. We agree that Badgett never made any claims under the ADA in his complaint, but he did make at least two passing references to the fact that certain areas of the courthouse were not readily accessible to the disabled. Because we are not basing the issuance of the writ of mandamus on the claims relating to these access issues, we will not address this contention further. However, it would be penny-wise and pound-foolish for the city to address the other flaws in the courthouse without also addressing the deficiencies under the ADA, particularly since the city engineer acknowledged in his deposition that the courthouse was not in compliance with the ADA and their failure to address these issues leaves the city open to a lawsuit under the ADA in federal court.

Council that in her opinion, the only way to ensure adequate facilities was to construct a new building.

{¶ 44} Furthermore, the parties agree that the city of Marietta has been grappling with the issue of building a new municipal court facility since the 1980s. Respondents state that over $1 million has already been spent on engineering, architectural, and consulting fees. And in April 2003, Judge Milt Nuzum—the prior Marietta Municipal Court judge—sent a memorandum to the previous mayor and Marietta City Council explicitly requesting that they build a new justice center for the court.

{¶ 45} Based on this evidence, it is apparent that the sitting municipal court judges have consistently opined that the court facilities are not suitable and that city council and the mayor have been put on notice of the need to address the problem.

### 2. The City of Marietta Does Not Have Adequate Funds to Build a New Municipal Courthouse

{¶ 46} This writ of mandamus does not require respondents to construct a new municipal courthouse; rather, it requires respondents to provide suitable accommodations for the court as mandated by R.C. 1901.36. However, we do recognize that as a practical matter, building a new courthouse may be the only way for the city to meet its statutory duty. It is clear that Judge Welch and at least some city council members believe that the existing court facilities cannot be satisfactorily renovated and that there are no existing buildings in Marietta that may be used to house the court and its offices.

{¶ 47} The city and intervenors contend that the city of Marietta is in dire financial straits and simply cannot afford the construction of a new courthouse. Badgett refutes this contention, noting that the municipal court contributes approximately $170,000 to $180,000 per year to its capital improvement fund and that money can be used to pay the debt on a new facility. The parties also agree that the city has a high bond rating and can issue bonds to cover the cost of the courthouse construction. Previous estimates showed that a new facility could be built for approximately $3.2 million, with a debt service of approximately $210,000 per year.[4] Since the city can contribute some additional money to pay the debt on a new facility, Badgett argues that a new facility is affordable.

{¶ 48} The city and intervenors argue that we can consider the city's financial condition in fashioning a remedy. We agree. In *State ex rel. Taylor v. Delaware* (1982), 2 Ohio St.3d 17, 18–19, 2 OBR 504, 442 N.E.2d 452, the Supreme Court of

---

4. Because this estimate is from several years back, it is unlikely that a new facility could still be built at this price.

Ohio concluded that the Delaware Municipal Court facilities were not adequate under R.C. 1901.36 and granted the writ of mandamus but noted that "this court is not unmindful of the present financial problems being experienced by political subdivisions in the state. Of necessity, those problems must be taken into account by both relator and respondents in satisfying the mandatory obligations imposed by R.C. 1901.36." But the court did not relieve the city of Delaware from its statutory duty.

{¶ 49} Furthermore, in *State ex rel. Durkin v. City Council of Youngstown* (1984), 9 Ohio St.3d 132, 134–135, 9 OBR 382, 459 N.E.2d 213, the Supreme Court recognized that it had previously refused to excuse a governmental body from fulfilling its mandatory duty based on a claim of hardship. Citing *State ex rel. Foster v. Lucas Cty. Bd. of Commrs.* (1968), 16 Ohio St.2d 89, 91, 45 O.O.2d 442, 242 N.E.2d 884; *State ex rel. Motter v. Atkinson* (1945), 146 Ohio St. 11, 15, 31 O.O. 472, 63 N.E.2d 440. The court further noted:

> The doctrine of separation of powers requires that the funds necessary for the administration of justice be provided to the courts:
>
> "It is a well-established principle that the administration of justice by the judicial branch of the government cannot be impeded by the other branches of government in the exercise of their respective powers. The proper administration of justice requires that the judiciary be free from interference in its operations by such other branches. Indeed, it may well be said that it is the duty of such other branches of government to facilitate the administration of justice by the judiciary." *State ex rel. Foster v. Bd. of County Commrs.*, supra, 16 Ohio St.2d at 92 [45 O.O.2d 442], 242 N.E.2d 884.
>
> The courts' authority to effectuate the orderly and efficient administration of justice without monetary or procedural limitations by the legislature is said to be within the inherent powers of the courts. *State ex rel. Johnston v. Taulbee* (1981), 66 Ohio St.2d 417, at 420–422 [20 O.O.3d 361], 423 N.E.2d 80.

Id. at 135, 9 OBR 382, 459 N.E.2d 213. See also Justice in Jeopardy: Report of the Commission on the 21st Century Judiciary, American Bar Association, at 82 (without sufficient funding, the independence of the courts and the judiciary's capacity "to preserve itself as a separate and co-equal branch of state government" would be threatened).

{¶ 50} We conclude that the city of Marietta's financial condition has some bearing on the remedy it must provide here. We have not ordered the city to build an extravagant facility. However, respondents cannot use the city's finances as an excuse to completely ignore their duty to comply with R.C. 1901.36. Furthermore, although the city of Marietta is clearly experiencing some financial difficulties, the evidence reflects that there is not a financial crisis of such

proportions that the city should not be required to provide suitable accommodations for the Marietta Municipal Court.

### 3. Relator Is Actually Seeking a Declaratory Injunction Preventing the Enforcement of the November 2006 Ordinance

{¶ 51} In November 2006, the voters of Marietta passed an ordinance stating:

Section 1: The City of Marietta shall not appropriate, expend, encumber, or pledge any public funds of the City of Marietta, from whatever source, or enter into any debt arrangement, for the construction, leasing, renting, furnishing, equipping, or maintenance of new building or office space for the Marietta Municipal Court. "New building or office space" means any physical space, other than that the Marietta Municipal Court's present location at 301 Putnam Street, Marietta, Ohio, and also means the adding of any addition to the building presently housing the Marietta Municipal Court. Nothing in this ordinance shall be construed to prevent funding for the operation of the municipal court as required by State law or for the physical maintenance and renovation of current facilities housing the Marietta Municipal Court.

Section 2: Notwithstanding section 1 of this ordinance, the public funds of the City of Marietta may be used for the construction, leasing, renting, furnishing, equipping, and maintenance of new building or office space for the Marietta Municipal Court, and the City may enter into a debt arrangement for such purposes, if the City Council first submits the question to the electors of the City at a general election and the question receives a majority affirmative vote of those electors voting at the election. The ballot question shall delineate the full expected costs for the new construction, leasing, renting, furnishing, equipping, and maintenance of a new building or office space and the means of financing and payment thereof.

Section 3: If any part of this ordinance is held by a court to be unenforceable, such holding shall not prevent all other parts from being effective.

Interestingly, neither the city nor the intervenors argue that this court cannot order respondents to construct a new courthouse or purchase or lease a new building for use by the Marietta Municipal Court based on this ordinance. However, the intervenors do argue that Badgett is attempting to seek a declaratory judgment that the ordinance is null and void. They contend that when the true purpose of a mandamus action is to obtain a declaratory judgment and prohibitory injunction, there is no cause of action in mandamus.

{¶ 52} We conclude this cause of action truly sounds in mandamus. Even in the absence of the ordinance passed by the voters, there is no guarantee that respondents would construct or purchase a new facility for the municipal court. So, a declaration that the ordinance is null and void would not necessarily achieve

compliance with R.C. 1901.36. Badgett is clearly seeking to compel respondents to comply with R.C. 1901.36 by asking this court to grant the writ of mandamus requiring respondents to provide suitable accommodations for the court.

{¶ 53} Furthermore, even though we have not directly been asked to decide the issue, we do question the legality of the referendum. Under Section 1f, Article II, Ohio Constitution, the referendum procedure can be used only to control those activities of municipal government that municipalities are empowered to control by legislative action. If the action consists of executing an existing law, the action is administrative and not the proper subject of a referendum by the voters. *State ex rel. Kleem v. Kafer* (1983), 13 Ohio App.3d 405, 406–407, 13 OBR 491, 469 N.E.2d 533, citing *Donnelly v. Fairview Park* (1968), 13 Ohio St.2d 1, 4, 42 O.O.2d 1, 233 N.E.2d 500.

{¶ 54} In *Kleem,* the Eighth District Court of Appeals noted that the core duty to provide adequate municipal court facilities is mandated by R.C. 1901.36. Id. at 407, 13 OBR 491, 469 N.E.2d 533. Therefore, a voter referendum directed to whether the city of Berea should enter into a contract for architectural services to design a new building to house noncourt facilities and to renovate the existing municipal court building was not the proper subject of a referendum. Id.

{¶ 55} Likewise, respondents are required by R.C. 1901.36 to provide suitable accommodations for the Marietta Municipal Court. Because the building or acquisition of a new court facility would be an action taken to execute R.C. 1901.36, a voter referendum on the issue seems inappropriate. See *Donnelly,* 13 Ohio St.2d 1, 42 O.O.2d 1, 233 N.E.2d 500, at paragraph two of the syllabus (the test for determining whether the action of a legislative body is legislative or administrative is whether the action taken is one enacting a law, ordinance or regulation, or executing or administering a law, ordinance, or regulation already in existence).

4. Badgett's Action Is Barred by the Doctrine of Laches

{¶ 56} The city also contends that Badgett's claims are barred by the doctrine of laches because in his affidavit he acknowledged that he knew about the problems with the municipal court facilities for several years before bringing this action.

{¶ 57} Laches constitutes " ' "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party. It signifies delay independent of limitations in statutes. It is lodged principally in equity jurisprudence." ' " *Wise v. Wise* (1993), 86 Ohio App.3d 702, 705, 621 N.E.2d 1213, quoting *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 15 OBR 134, 472 N.E.2d 328, quoting *Smith v. Smith* (1957), 107 Ohio

App. 440, 8 O.O.2d 424, 146 N.E.2d 454. Delay itself does not give rise to the defense of laches. Id. In order to invoke a laches defense the defending party must show that he has been materially prejudiced by the delay of the party asserting the claim. Id.; see also *Smith v. Smith* (1959), 168 Ohio St. 447, 7 O.O.2d 276, 156 N.E.2d 113, paragraph three of the syllabus. "Material prejudice is established upon a showing of either (1) the loss of evidence helpful to the defendant's case; or (2) a change in the defendant's position that would not have occurred had the plaintiff not delayed in asserting her rights." *Weber v. Weber* (Dec. 27, 2001), Jackson App. No. 01CA7, 2001 WL 1682945, citing *State ex rel. Donovan v. Zajac* (1998), 125 Ohio App.3d 245, 250, 708 N.E.2d 254.

{¶ 58} Neither the city nor the intervenors can demonstrate that either of them suffered material prejudice as a result of any delay by Badgett in bringing this action. Therefore, we do not apply the doctrine of laches.

### V. Attorney Fees

{¶ 59} Badgett requests that this court award him attorney fees under R.C. 733.61, which states:

> If the court hearing a case under section 733.59 of the Revised Code is satisfied that the taxpayer had good cause to believe that his allegations were well founded, or if they are sufficient in law, it shall make such order as the equity of the case demands. In such case the taxpayer shall be allowed his costs, and, if judgment is finally ordered in his favor, he may be allowed, as part of the costs, a reasonable compensation for his attorney.

The decision to award attorney fees to a successful relator in an R.C. 733.59 taxpayer suit lies within the court's discretion. *State ex rel. Commt. for Charter Amendment Petition v. Avon* (1998), 81 Ohio St.3d 590, 595, 693 N.E.2d 205, 209.

{¶ 60} The city and intervenors contend that Badgett is not entitled to attorney fees because he did not fully comply with R.C. 733.59, which states that "[n]o * * * suit or proceeding shall be entertained by any court until the taxpayer gives security for the cost of the proceeding." They argue that Badgett's failure to give security in this case renders him unable to collect attorney fees.

{¶ 61} We disagree. In *State ex rel. Fisher v. Cleveland,* 109 Ohio St.3d 33, 2006-Ohio-1827, 845 N.E.2d 500, at ¶ 44–45, the Supreme Court of Ohio held that when a court waives the security requirement of R.C. 733.59, this precondition is satisfied and the court may award attorney fees. Because we previously granted Badgett's motion to waive security costs, he may collect attorney fees under R.C. 733.61.

{¶ 62} Furthermore, because Badgett successfully prosecuted this action and provided a public benefit to his community by ensuring that the city complies

with their statutory duty to provide "suitable accommodations" for the Marietta Municipal Court, we grant his request for attorney fees as specified below.

## VI. Conclusion

{¶ 63} We hereby grant the requested writ of mandamus and direct the city to provide suitable court facilities for the Marietta Municipal Court in compliance with R.C. 1901.36 and the Rules of Superintendence. Because we are confident that the parties can work together to accomplish this task, this mandate is to be effected through the cooperative efforts of the Marietta municipal court judge, Badgett, and the city. We retain jurisdiction over this mandate as necessary to ensure compliance. The parties are ordered to advise this court of their progress, in writing, every six months. In the event the parties are unable to reach a resolution, we will refer the matter to this court's magistrate for a hearing on the disputed issues.

{¶ 64} Badgett is ordered to submit a bill and documentation supporting the requested amount of attorney fees within 30 days of the journalization of this decision and judgment entry. The city and intervenors may file a response within 20 days thereafter, and Badgett may file a reply within ten days.

Writ granted.

ABELE, P.J., and KLINE, J., concur.

## ADDENDUM

Appendix C. Court Security Standards

### PREAMBLE

Ohio courthouses represent justice and reason. Court facilities must be safe and secure for all those who visit and work there.

The Court Security Standards balance many competing concerns. The Supreme Court/Judicial Conference Committee on Court Security recognizes that there has been an increase in the use of weapons in our society. The Committee recognizes that providing security carries a financial price. The Committee also recognizes the diversity of the court system—urban and rural, large and small—and that courts deal with emotional issues. The Standards attempt to balance the diverse interests in each community by the use of local court security advisory committees for each trial and appellate court. The committees will be comprised of a broad range of interested community parties, and will examine each court's security needs, including the facilities and the resources available, and adopt a plan that addresses the unique needs of that court.

These standards are not mandates. Rather, they are goals to which the courts should aspire to ensure safe access to all.

### CSS 1 Security policy and procedure manual

A written Security Policy and Procedures Manual governing security of the court and its facilities shall be established by each court to ensure consistent, appropriate and adequate security procedures. The manual shall include: a physical security plan, routine security operations, a special operations plan, a hostage situation response plan, a high risk trial plan, and emergency procedures (fire, bomb, disaster).

### CSS 2 Local court security advisory committee

Each court should appoint a Local Court Security Advisory Committee for the purpose of implementation of these standards.

### CSS 3 Persons subject to security screening

All persons entering the court facility, including elected officials, court personnel, attorneys, law enforcement and security officers, should be subject to security screening. All screening should occur for each visit to the court facility regardless of the purpose or the hour.

### CSS 4 Court security officers

A. Uniformed, armed law enforcement officers should be assigned specifically, and in sufficient numbers to court security, to ensure the security of each court and court facility.

B. All security officers assigned to court security should be certified through the Ohio Peace Officers Training Council. These officers should receive specific training on court security and weapons instruction specific to the court setting.

### CSS 5 Weapons in court facilities

A. No weapons should be permitted in the court facility except those carried by court security officers or as defined in Section B provided the court establishes and installs adequate security measures to insure that no one will be armed with any weapon in the court facility.

B. Each court should establish a local court rule governing carrying of weapons into the court facility by law enforcement officers acting within the scope of their employment.

C. In all cases, law enforcement officers who are parties to a judicial proceeding as a plaintiff, defendant, witness, or interested party outside of the scope of their employment should not be permitted to bring weapons into the court facility.

### CSS 6 Prisoner transport within court facilities

A. Prisoners should be transported into and within the court facility through areas which are not accessible to the public. When a separate entrance is not available and public hallways must be utilized, prisoners should be handcuffed behind the back and, when appropriate, secured by leg restraints.

B. Prisoners should be held in a secure holding area equipped with video monitoring, where practicable, while awaiting court hearings and during any recess.

### CSS 7 Duress alarms for judges and court personnel

All courtrooms and hearing rooms should be equipped with a duress alarm connected to a central security system. Duress alarms should be located on the judge's, referee's and magistrate's bench and at the work station of the bailiff, the receptionist, the secretary, and other officers. The duress alarm system should be a system with enunciation capability.

### CSS 8 Closed-circuit video surveillance

When practicable, closed-circuit video surveillance should include the court facility parking area, entrance to the court facility, court lobby, courtroom and all other public areas of the court facility.

### CSS 9 Restricted access to offices

An effective secondary screening process at the entrance to the judges' office space should be utilized to ensure safe and secure work areas and to protect against inappropriate interaction between judicial officers, including referees and magistrates, and participants in the judicial process. The general public should not be permitted in the area that houses office space for judges and court personnel.

### CSS 10 After-hours security for emergencies

As part of a comprehensive security plan, each court, in conjunction with law enforcement officers, should adopt procedures for the security of judges and court personnel for periods of time other than the normal working hours.

### CSS 11 Structural design of courtrooms and hearing rooms

New construction or remodeling of court facilities should include circulation patterns that govern the movement of people in the courtroom. Judges, court personnel and prisoners should have separate routes to and from the courtroom. Waiting areas should be available to allow separation of parties, victims and witnesses.

CSS 12 Incident reporting

A.   Every violation of law that occurs within a court facility should be reported to the law enforcement agency having jurisdiction.

B.   Each court should adopt a policy for reporting security incidents and should include the policy in the court's Security Policy and Procedures Manual.

C.   A summary of such incidents should be compiled annually for the court's benefit in evaluating security measures.

Appendix D.   Court Facility Standards

These standards apply to all courts of record in Ohio except as otherwise indicated.   The standards represent the minimum requirements to ensure the efficient and effective administration of justice and are intended to complement federal, state, and local laws, regulations, and standards pertaining to building construction, safety, security, and access.

*(A)  General Considerations.*

In order to maintain suitable judicial atmosphere and properly serve the public, clean, well-lighted, adequately heated and air-conditioned court facilities shall be provided and maintained.

*(B)  Location.*

The facilities should be located in a courthouse or county or municipal building. The location within the building should be separate from the location of non-judicial governmental agencies.   Court facilities should be located in a building that is dignified and properly maintained.

*(C)  Courtroom.*

Every trial judge should have a separate courtroom.   The courtroom should have adequate seating capacity so that litigants and others are not required to stand or wait in hallways and areas adjacent to the courtroom.

All participants must be able to hear and to be heard.   If the room acoustics are not satisfactory, an efficient public address system shall be provided.

The witness chair should be near the bench, slightly elevated, and situated in an appropriate enclosure.

Desks, tables, and chairs should be provided for all court personnel regularly present in the courtroom.

Tables and chairs should be provided for parties and counsel.   Tables shall be situated to enable all participants to hear and to allow private interchanges between litigants and counsel.

Each trial courtroom should be equipped with a jury box, suitable for seating jurors and alternates sufficient to meet the demands of the court. The jury box should be situated so that jurors may observe the demeanor of witnesses and hear all proceedings.

A blackboard and other necessary demonstrative aids should be readily available. Unnecessary material or equipment should not be kept in the courtroom.

Each judge should have private chambers convenient to the courtroom. Access from chambers to the courtroom should be private. Chambers should be decorated and equipped in appropriate fashion.

*(D) Library.*

Each court shall be provided an adequate law library comprised of those materials, including electronic media, considered necessary by the court.

*(E) Magistrate.*

Magistrates should have courtroom and office facilities similar to those of a judge.

*(F) Juror and Witness Facilities.*

Each trial courtroom shall have a soundproof jury deliberation room located in a quiet area as near the courtroom as possible. Access from the jury deliberation room to the courtroom should be private. Private personal convenience facilities should be available for the jurors.

An adequate waiting room must be provided for jurors. Reading material of general interest, television, and telephones should be provided.

A waiting room comparable to the jurors' waiting room should be provided for witnesses.

*(G) Consultation Room.*

A room should be provided for use of attorneys.

*(H) Violations Bureaus and Pay-In Windows.*

Facilities for violations bureaus and pay-in windows should be located near public parking areas.

*(I) Court Staff and Court–Related Personnel Facilities.*

Adequate space and equipment shall be provided for court personnel to prepare, maintain, and store necessary court records. Space and equipment should be utilized to ensure efficiency, security, and confidentiality.

Adequate restroom facilities separate from public restroom facilities should be provided for all court personnel.

*(J) Public Convenience Facilities.*

Clean, modern restroom facilities should be available in the vicinity of the public areas of the court. Public telephones should be available and afford privacy.